Filed 6/20/16  In re D.D. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.D., a Person Coming Under the Juvenile Court Law. | B267965 (Los Angeles County Super. Ct. No. DK06603) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>I.N.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Emma Castro, Judge.  Dismissed, in part, and affirmed, in part.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

I.N. (mother), the mother of minor D.D., appeals from the juvenile court's jurisdiction and disposition orders against her, arguing that those orders were not supported by sufficient evidence. The Department of Children and Family Services (DCFS) contends that the appeal from the jurisdictional findings against mother is moot as nonjusticiable because the court's jurisdictional findings as to D.D.'s father (father) were a sufficient basis upon which to exercise the court's jurisdiction over D.D., and because the juvenile court did not abuse its discretion in issuing the disposition orders.

We decline to exercise our discretion to review the jurisdictional findings against mother because she has failed to establish an exception to the justiciability doctrine. We further hold that based on the evidence in the record, the trial court did not abuse its discretion in issuing the disposition orders. We therefore dismiss mother's appeal from the jurisdictional findings and affirm the disposition orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In a petition filed pursuant to Welfare and Institutions Code sections 300,[1] DCFS alleged in count a-1 that the six-day-old minor D.D.'s mother had physically abused him by grabbing him by his head and repeatedly shaking him; in count b-1 that mother's physical abuse of D.D. as alleged in count a-1 constituted a failure to protect him from physical harm; in count b-2 that mother had engaged in a physical altercation with D.D.'s father, including "a tug of war with the child," that endangered D.D.'s health and safety and placed him at risk of future harm; and in count b-3 that mother's history of mental and emotional problems, including auditory hallucinations, delusional behavior, and assaultive behavior, rendered her incapable of providing D.D. with regular care and supervision, thereby endangering his health and safety and placing him at risk of future harm. The petition also asserted allegations against father based on his physical

---

[1] All further statutory references are to the Welfare and Institutions Code.

altercation with mother and his criminal history, including a conviction for having sexual intercourse with a minor.

In a July 30, 2014, detention report, a children's social worker (CSW) reported that she received a referral alleging emotional abuse and neglect of D.D. According to the referral, on July 27, 2014, mother and father engaged in an argument during which father punched mother several times in the face causing bruises and abrasions. Father picked up D.D. and attempted to leave with him, but a family friend intervened and returned D.D. to mother. Father then fled the scene. Mother required medical attention. Mother and D.D. left the home and they moved in with her mother (D.D.'s maternal grandmother).

The CSW further reported that early on the morning of July 28, 2014, mother began "to display mental health issues," resulting in a second referral. That referral alleged that mother was hallucinating and acting violent at the maternal grandmother's home and in public. Mother was taken to Northridge Hospital and evaluated for a psychiatric hold. DCFS detained D.D.

When the CSW interviewed mother about the July 27, 2014, domestic violence, mother explained that she and father had been arguing about the D.D.'s care. Mother left to rent a movie, but when she returned, father began accusing her of neglecting D.D. Father was holding D.D. and mother told him that the baby had been fed and needed to be put down. When father refused, mother tried to take D.D. from him. Father put the baby down and, "all of a sudden," he started beating mother. He punched her with his fist in the face and body, "[m]aybe twenty times." It was as if a "demon got into him."

Mother told the CSW that the incident was not the first time father "beat [her] up. When [she] was pregnant, he beat [her] up too. It happened about 3 times." Mother never reported the prior incidents. Mother was afraid of father and did not want to be with him anymore. Mother said her eye and lips were swollen and she had cuts on both eyes and scratches on her neck.

The CSW asked mother about her behavior on July 28, 2014. Mother stated that the police had taken her to Northridge Hospital emergency room for psychiatric

3

evaluation. Mother believed that everyone was trying to take D.D. from her, that the maternal grandmother had molested her in the shower that morning, and that the maternal grandmother's erratic driving was intended to kill mother and D.D.

The CSW also interviewed maternal grandmother, who reported that mother had called her and told her that father had "beat [mother] up pretty bad." She also reported that in 2012, mother had been hospitalized for two weeks following an incident during which "someone slipped some 'meth' into her drink and she started acting very bizarre."

The maternal grandmother explained that in the evening July 27, 2014, mother "started exhibiting behaviors that were very odd." Mother started talking to herself and cursing "very loud." Mother could not feed D.D. correctly. She was holding the baby by his head and shaking him while she held him. Mother did not want anyone near D.D. and did not want anyone to change him. She "kept talking about child molesting." She did not want the maternal grandmother to leave her alone, and kept saying, "he is coming to beat me." If mother heard a noise, she became paranoid and would yell, "'It is him, it's him.'" Mother then physically threatened her sister and the maternal grandmother. The maternal grandmother called paramedics to evaluate mother because she was exhibiting "the same behaviors that [the maternal grandmother had seen] two years ago . . . ." Mother's family stayed up with mother all night because they feared that if they left her alone with D.D., she would hurt him.

The next morning, the maternal grandmother told mother that they should take D.D. to the doctor. Mother calmed down, but as soon as they began to drive, she started hallucinating. Mother kept screaming that the maternal grandmother was "not driving right and . . . was trying to hurt her and the baby." Mother wanted out of the car and, when they neared the doctor's office, mother left the car with D.D. in his car seat and tried to walk away. Because mother would not release D.D., the maternal grandmother called 911. The police arrived, handcuffed mother, and took her to the hospital. The maternal grandmother believed that mother "definitely had a breakdown" and that she could not be left alone with D.D.

4

At the July 30, 2014, detention hearing, the juvenile court found that a prima facie case had been made for detaining D.D. and that he was a person described in section 300. The juvenile court concluded that there was a substantial danger to the physical or emotional health of D.D. and that there were no other reasonable means to protect him without removing him from the home. Accordingly, the juvenile court concluded that "continuance in the home is contrary to the child's welfare." The juvenile court detained D.D. in shelter care and ordered DCFS to release him to any appropriate relative. The matter was continued to September 10, 2014, for a jurisdiction hearing.

In a September 10, 2014, jurisdiction/disposition report, a CSW reported that father could not be located for an interview. The CSW interviewed, among others, mother's maternal cousin, who reported that mother was currently residing with her in her home. The cousin believed that in interacting with D.D., mother was "'a little unsure of herself . . . new mom things. . . . She need[ed] to be supervised.'" "[M]other [was] not left alone with [D.D. at her cousin's house] as 'she need[ed] someone to tell her what to do, when to do it and how to do it.'" Mother had been spending time with D.D. at the maternal grandmother's house. As for mother's general mood, she was "'pretty quiet and tend[ed] to zone out a lot. She need[ed] to keep busy. She ha[d] a lot of support.'" According to the cousin, mother had not had any contact with father.

The CSW concluded that D.D.'s safety could not be assured in the care of mother because there was a substantial danger to his health, safety, and emotional well being. The CSW recommended that mother be provided with family reunification services and ordered to participate in and complete a parenting program addressing infant care, a domestic violence program for victims, including counseling, and psychiatric services to address medication management.

In an additional September 10, 2014, information provided to the court, a CSW reported that the maternal grandmother had concerns that mother was trying to renew her relationship with father. Mother had been "secretive" and had been communicating by telephone with someone who had a San Pedro number. Father lived in San Pedro. Mother told the maternal grandmother that she was not going to participate in domestic violence

5

counseling or parenting classes until she was ordered by the court to do so. The maternal grandmother also was concerned that mother had stopped taking her medications. In addition, the maternal grandmother observed that mother had only been visiting D.D. for a short time in the mornings, but then was gone all day, returning in the evenings for short visits. She did not know what mother was doing during the day because mother was not enrolled in any case plan services.

In a January 20, 2015, first amended petition, DCFS realleged in counts a-1, b-1, b-2, and b-3, that mother had: physically abused D.D; failed to protect him from physical abuse; engaged in a physical altercation with father; and suffered from mental and emotional problems that endangered D.D. and put him at risk of physical harm. The amended petition also added new allegations against father based on his history of mental and emotional problems and his history of drug and alcohol abuse.

In a January 20, 2015, supplemental report, a CSW reported that on September 12, 2014, she had met with father at his home. Mother was present at the interview and reported that she would begin individual therapy at San Pedro Mental Health on October 29, 2014, and that her medication would be reevaluated at that time. Mother added that she also had been given referrals for domestic violence counseling and parenting classes, and she denied experiencing hallucinations or other psychiatric symptoms.

Father reported that he and mother had reunified and had been married a few days earlier at his aunt's house where they were living. He and mother wanted to put the issues that resulted in this case behind them and do "whatever [they had] to do to get [their] son back." Father explained that he had made a mistake by not continuing with his mental health treatment and became "overwhelmed by the situation." Father admitted punching mother in the face and body. According to father, mother had experienced visual and auditory hallucinations for several days after D.D. was born. On the day of the altercation, she began hallucinating and "it was worse . . . ." Mother had been nursing D.D. and father took him from her. When mother tried taking D.D. back, father resisted and physically assaulted mother. He blamed the incident on "too much stress" and the fact that he had not been taking his medication for his own mental health problems.

6

Mother explained that "evil spirits" caused her injuries. She and father were praying daily and believed that prayer would "ward off the evil spirits." Mother blamed a visit from the maternal grandmother on the day of the incident, claiming she brought evil spirits into the house which caused the altercation between mother and father. Mother said she would protect D.D. by prayers.

In March 26, 2015, information provided to the court, a CSW reported that father had made no contact with DCFS since October 2, 2014. As a result, DCFS did not know whether father was enrolled in any services. Mother had contacted DCFS only twice by phone since October 2014. On March 12, 2015, mother contacted DCFS and said she was participating in individual therapy at San Pedro Mental Health but was not receiving any psychiatric services or taking any medication. She also said she was enrolled in parenting classes and domestic violence counseling. D.D.'s caregivers reported that mother's visits with D.D. were sporadic with a lack of bonding with the child. Mother had not visited him since January 2015 and that visit lasted only 10 minutes. Father had not visited D.D.

In an August 25, 2015, progress report, a CSW reported that father had not contacted with DCFS for almost a year. He had not participated in random drug testing or any domestic violence programs. He also had not provided proof that he was receiving mental health treatment or that he was medication compliant.

Mother was receiving mental health treatment at San Pedro Mental Health, and her case manager there reported that at the beginning of her treatment, she was diagnosed with a schizoaffective disorder. According to the case manager, however, mother was not currently hallucinating and did not have a formal diagnosis. Mother denied hallucinating and said she was not on any medications. Mother was enrolled and had attended 14 sessions in a domestic violence program. Mother stated that she and father lived together and planned to stay together. Mother's visits with D.D. were sporadic, and he did not recognize her when she did visit. Mother became irritated during visits and, on one occasion, told the caregiver that she should "'pop [D.D.] in his mouth'" because he was making "'[r]aspberry' noises . . . ."

7

In September 24, 2015, information provided to the court, a CSW reported that she met with mother and father on September 3, 2015. Father stated that, despite being provided by DCFS with transportation funds, he would not visit D.D. at DCFS's Chatsworth office. Father could not provide the CSW with any progress letters from court ordered programs.

Mother informed the CSW that, despite being provided by DCFS with transportation funds, she believed the juvenile court's visitation orders were wrong because she did not want to visit D.D. at her mother's house. Mother also informed the CSW that her attorney advised her to move out of father's residence "'because it would look good [to the] court.'" Nevertheless, mother wanted to continue her relationship with father. The CSW contacted mother's case manager at San Pedro Mental Health for updates on mother's progress, but the manager did not provide additional information.

At the September 29, 2015, adjudication/disposition hearing, the trial court admitted DCFS's eight exhibits, including its reports and mother's two exhibits, which were letters from her domestic violence program and her case manager at San Pedro Mental Health. After hearing argument, the trial court ruled from the bench that: "The court has received petitioner's exhibits and mother's exhibits and has listened to argument by all parties, and the court is ready to make a ruling on the petition. [¶] The court as to count A-1 and B-1 dismisses those counts in their entirety for insufficient evidence. [¶] As to count[s] B-2, B-3, those counts are sustained as pled. [¶] B-4 is dismissed for lack of nexus to a current or future failure to protect without any further information to the court."

The juvenile court explained its ruling on the sustained counts by providing a detailed review and analysis of DCFS's evidence. According to the juvenile court, there was ample evidence that mother had a history of serious mental problems that required medication, but it appeared that she was not taking her medication. The juvenile court also noted that a January 2015 report contained statements by mother that indicated she was still seriously delusional at that point. In addition, the March 2015 report indicated that mother was not taking her medication or receiving psychiatric services, which

8

prompted the juvenile court to conclude that "given the mother's history as documented in the report, the court has concerns that her mental health status continues to be unresolved. [¶] Further, it appears that mother did not sign consent of information, at least in March of 2015, so that [DCFS] could receive information as to mother's progress, her status in terms of mental health services, whether or not she should be taking psychotropic medication, and how all of those intersect and impact her ability to care for an infant."

The juvenile court then expressed its concern that although the parents may have participated in some mental health services, "[I]t's not just the rote participation in a mental health treatment program or services, but what [the parents] are actually internalizing and learning in order to address their history of mental health issues. [¶] The report of May 21st, 2015, indicates that there was no confirmation at that point that parents had enrolled in services, and that is because parents were not staying in contact with the social worker as indicated in the regular progress reports through [the] last-minute information filed with the court."

Of particular concern to the juvenile court was mother's statement to the caregiver that appeared to condone the physical abuse of D.D. "It appears that the mother made a very concerning statement regarding a visit to the child on August 25, 2015. At page 2, mother told the caregiver, you should pop him in his mouth. He needs to stop, because the baby was said to be making raspberry noises, and it appeared to be irritating the mother."

Mother's sporadic visitation with D.D. and her apparent failure to bond with the infant also factored into the juvenile court's jurisdictional findings against mother. "It appears that the mother's visits continue to be, throughout the entire first year of the child's life, sporadic and short in duration."

After reviewing the evidence in support of the petition, the juvenile court turned to mother's evidence—the letter from mother's domestic violence program and the letter from the case manager at San Pedro Mental Health—and concluded that it was inadequate and entitled to little, if any, weight. "I find that these reports on behalf of the

9

mother have very little detailed information, and I give them very little weight, frankly. [¶] So the court finds by a preponderance of the evidence the allegations as indicated [are] sustained and the allegations as indicated [are] dismissed. So counts B-1, B-6 and D-1 are dismissed. The remaining counts are sustained as pled."

The juvenile court then ruled on disposition as follows: "The child is hereby declared a dependent of the court under [section] 300. [¶] The court finds by clear and convincing evidence pursuant to [section] 361(c) that there is a substantial danger if the child were returned home to the mother and father to the child's physical and emotional well-being, and no reasonable means by which to protect same without removing the child from the custody of the parents. [¶] The court orders the child removed from parents with whom the child resided at the time the petition was filed. [¶] Reasonable efforts were made to prevent and eliminate the need for the child's removal from the home of the custodial parents. [¶] Court orders care, custody and control of the child to be vested with DCFS under supervision of DCFS. [¶] [DCFS] is ordered to provide low-cost/no-cost referrals for family reunification services."

The juvenile court then ordered the services for mother. "The mother is ordered into the following services: you're ordered to participate in a program of domestic violence, a support group for victims. You're to provide a letter from wherever it is you're receiving those services indicating that you are receiving services to address issues of domestic violence. [¶] You're to participate, if you have not yet completed a program of parenting for toddlers now that [your] son is 14, 15 months old. [¶] You are to participate in mental health counseling and either obtain a psychological or a psychiatric evaluation through the Department of Mental Health. [¶] If recommended, you're to take all prescribed psychotropic medication. [¶] You're to continue participating in individual counseling to address case issues with a licensed therapist."

10

## DISCUSSION

### A.     Jurisdiction

Mother challenges the sufficiency of the evidence in support of the juvenile court's true findings on the jurisdictional allegations asserted against her in the amended petition.  But mother does not challenge the sufficiency of the evidence in support of the jurisdictional allegations asserted against father that were also found true by the juvenile court.  DCFS contends that mother's challenge to the jurisdictional findings against her should be dismissed because the unchallenged jurisdictional findings against father were sufficient to support the juvenile court's exercise of jurisdiction over D.D., regardless of the sufficiency of the evidence in support the jurisdictional findings against mother.

#### 1.     *Justiciability*

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  "It is commonly said that the juvenile court takes jurisdiction over children, not parents.  [Citations.]  While this is not strictly correct, since the court exercises *personal* jurisdiction over the parents once proper notice has been given [citation], it captures the essence of dependency law.  The law's primary concern is the protection of children.  [Citation.]  The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated.  [Citation.]  The acquisition of personal jurisdiction over the parents through proper notice follows as a consequence of the court's assertion of dependency jurisdiction over their child.  [Fn. omitted.]  [Citations.]  Parental personal jurisdiction allows the court to enter binding orders adjudicating the parent's relationship to the child [citation], but it is not a

11

prerequisite for the court to proceed, so long as jurisdiction over the child has been established.  [Citation.]  Further, every parent has the option not to participate in the proceeding, even if properly noticed.  [Citation.]  [¶]  As a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child.  [Citations.]  Once the child is found to be endangered in the manner described by one of the subdivisions of section 300—e.g., a risk of serious physical harm (subds. (a) & (b)), serious emotional damage (subd. (c)), sexual or other abuse (subds. (d) & (e)), or abandonment (subd. (g)), among others—the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred.  [Citation.]  For jurisdictional purposes, it is irrelevant which parent created those circumstances.  A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established.  [Citation.]  As a result, it is commonly said that a jurisdictional finding involving one parent is '"good against both.  More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent."'  [Citation.]  For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence.  [Citations.]"  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.)

### 2.     *Analysis*

Because the jurisdictional findings against father are uncontested, it is undisputed that the juvenile court had the jurisdiction to declare D.D. a dependent of the court and make disposition orders under its broad discretionary power to act in the minor's best interests.  Thus, there is no need to review the evidence in support of the allegations against mother to determine if they were supported by substantial evidence.  Based on the unchallenged, sustained allegations against father, D.D. was a person described in section 300, subdivision (b) over whom the juvenile court had the discretionary jurisdiction act.

12

Nevertheless, mother argues that her appeal from the jurisdictional findings against her is not moot under the justiciabilty doctrine.  According to mother, she is entitled to a discretionary exception to that doctrine because those findings served as the basis for the dispositional orders which she challenges on appeal and because those findings, if not reversed, could cause her harm in future proceedings.

Mother's argument is based upon the recognized discretionary exception to the justiciability doctrine.  "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation])."  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Although mother also appeals from certain of the juvenile court's dispositional orders, she cannot show that she is prejudiced by those orders because, as explained below, the evidence of mother's unaddressed mental issues and her failure to adequately confront the issues underlying the domestic violence incidents with father supported the issuance of those orders.  Therefore, we conclude that the trial court did not abuse its discretion in making those orders and, as a result, decline to exercise our discretion to review whether the jurisdictional findings against mother were supported by substantial evidence.  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474 ["The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  On appeal, this determination cannot be reversed absent a clear abuse of discretion"].)

Similarly, mother has failed to show how the juvenile court's jurisdictional findings against her will prejudice her in future dependency proceedings.  At most, she merely speculates that she might be prejudiced during some unspecified future proceeding.  Absent a specific showing of some realistic potential for future prejudice, we decline to exercise our discretion to review the factual basis for the jurisdictional findings against mother.  (See *In re I.A., supra*, 201 Cal.App.4th at pp. 1494-1495.)

13

**B.     Disposition**

Mother contends that even if the juvenile court had jurisdiction over D.D., it nevertheless abused its discretion when it ordered her to participate in psychiatric services and a domestic violence program for victims. According to mother, there was insufficient evidence to support the issuance of either order because her evidence showed that she had participated in therapy at San Pedro Mental Health and had completed 14 classes in a domestic violence program.

As explained, the "'court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion.' (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [57 Cal.Rptr.2d 861].) As an appellate court, we cannot reverse the court's dispositional order absent a clear abuse of discretion. (*Ibid*.) A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706].)" (*In re N.M*. (2011) 197 Cal.App.4th 159, 171.)

Here, the juvenile court did not abuse its discretion when it ordered mother to further participate in psychiatric services and a domestic violence program for victims. Although mother presented evidence that she had participated in domestic violence and mental health counseling, the juvenile court gave that evidence little, if any, weight because it was not specific about the details of mother's counseling and her progress, if any, in those programs.

In addition, the evidence supported the juvenile court's conclusion that mother's mental health issues had not been properly addressed, including that her mental and behavioral problems may require medication. That evidence also showed that father had his own unaddressed mental problems that required medication he was not taking. The juvenile court was therefore well within its discretion in issuing an order requiring mother to participate further in psychiatric services to ensure that she was receiving the necessary treatment and medication to address her serious mental health issues.

14

The evidence also supported the juvenile court's view that mother had not adequately addressed the issues that resulted in the domestic violence incident with father. Even though mother had attended several sessions of domestic violence counseling, father had not attended any sessions and had not addressed his own mental problems or taken the necessary medication to deal with them. Nevertheless, mother had moved back in with father, despite the fact that he had not addressed his own mental issues and refused to take necessary medication, and she had made statements that demonstrated she did not yet fully comprehend the underlying issues that led to the domestic violence incidents with father. Her actions and beliefs clearly warranted the order requiring her to adequately address the issues that resulted in the violent incident, and, as a result, the juvenile court was well within its discretion to issue its order requiring more domestic violence counseling.

**DISPOSITION**

Mother's appeal from the juvenile court's jurisdictional findings against her is dismissed as nonjusticiable and the dispositional orders from which she appeals are affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


RAPHAEL, J.*


We concur:


TURNER, P. J.


KRIEGLER, J.

---

*      Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.